IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Samuel Span (R12605), | ) |
| | ) |
|     Plaintiff, | ) |
| | ) Case No: 15 CV 50063 |
| v. | ) |
| | ) Judge Philip G. Reinhard |
| Donald Enloe, *et al.*, | ) |
| | ) |
|     Defendants. | ) |

**ORDER**

For the reasons stated below, defendants' motions for summary judgment [256, 272] are granted, and judgment is granted in their favor on all counts. This case is closed.

**MEMORANDUM, OPINION, AND ORDER**

Plaintiff alleges that, in 2014, prison officials at the Dixon Correctional Center ("Dixon") failed to adequately consider his psychiatric illnesses when dealing with him in various ways. He alleges specifically that the defendants were allegedly careless in choosing where to house him, putting him in several situations that caused him anxiety and increased his risk for suicide; they failed to anticipate that he would try to commit suicide, which he attempted to do on October 19, 2014; a few weeks later, on November 2, 2014, they put him on what he alleges was an overly-restrictive suicide watch, which then led to the calling of a tactical team to extract him from his cell and in the process he was pepper sprayed and ended up with a puncture wound to his lip; and, over the last few months of 2014, they repeatedly disciplined him and gave him segregation time without taking into account that his behavior was caused by his illnesses.

In 2015, plaintiff filed a *pro se* complaint. This court subsequently appointed counsel who later filed an amended complaint and conducted discovery. Now before the court are summary judgment motions filed by the four Wexford defendants and the four IDOC defendants. These motions are fully briefed. Defendants argue generally that they acted in good faith and that their decisions clearly did not rise to the level of deliberate indifference.

Although the facts will be discussed in more detail below, the following facts will provide an initial overview. From time to time since 2002, plaintiff has been an inmate in the custody of the Illinois Department of Corrections ("IDOC"). [Third Amended Complaint [189] "3AC," ¶ 17.] In April 2014, he was transferred to Dixon where he stayed until January 2015, when he was transferred to Pontiac Correctional Center. This lawsuit focuses on the last three months of 2014.

Plaintiff has been diagnosed as having, among other things, schizoaffective disorder, anxiety disorder, post-traumatic stress disorder, and bipolar disorder. *Id.* ¶ 19. He suffers from

paranoia, hears voices, and is sometimes delusional. *Id.* Plaintiff has been classified as "seriously mentally ill" ("SMI"). "SMI" inmates are seen more frequently by the mental health staff than non-SMI inmates. WSOF ¶ 6.

From September to December 2014, plaintiff was repeatedly cited for inmate offenses. *Id.* ¶ 23. He alleges that many of the offenses "are so vaguely or loosely defined that they cover a wide range of conduct, permit correctional officers to arbitrarily classify conduct as offenses, and fail to provide prisoners with reasonable notice of what conduct can result in discipline." *Id.* ¶ 22. He argues that the defendants unreasonably recommended segregation sentences as "the primary and preferred punishment" for his offenses and failed to acknowledge that these offenses were "in whole or in part, caused by or attributable to his Mental Health Conditions." ¶ 23.

In his two response briefs, plaintiff does not base his arguments on the particular facts of the many individual offenses for which he was found guilty. Even though these particulars do not play a material role in the arguments, to provide some context, the court will list the offenses and punishments. These come from Wexford's Rule 56.1 statement and are undisputed by plaintiff.

- *August 2014.* Plaintiff received a disciplinary ticket for disobeying a direct order and violation of rules. He received a 15-day yard restriction.
- *September 17, 2014.* Plaintiff received a disciplinary ticket for insolence, disobeying a direct order, and violation of rules. He received one month of C-grade and one month of commissary restrictions. A "C-grade" restriction limited plaintiff's institutional privileges, such as using the telephone.
- *September 21, 2014.* Plaintiff received a ticket for giving false information to an employee, insolence, and unauthorized movement. He was given another month of C-grade status.
- *September 22, 2014.* Plaintiff received a disciplinary ticket for insolence and violation of rules. He was found guilty of insolence and given another month of C-grade status.
- *September 24, 2014.* Plaintiff received a disciplinary ticket for damage or misuse of property, theft, and possession of contraband related to his possession of an extra mattress. He was found guilty of possession of contraband and was given 15 days of commissary restriction.
- *September 24, 2014.* Plaintiff received a second disciplinary ticket for insolence and disobeying a direct order after telling a correctional officer "Fuck you motherfucker" and refusing a copy of another disciplinary ticket. He was sentenced to one month C-grade status and 10 days of segregation.
- *September 24, 2014.* Plaintiff received a third disciplinary ticket for disobeying a direct order and violation of rules. He received one month C-grade status and 5 days of segregation.
- *September 30, 2014.* Plaintiff received a disciplinary ticket for insolence related to calling a nurse by her first name.
- *October 19, 2014.* Plaintiff received a disciplinary ticket for insolence, unauthorized movement, and disobeying a direct order after throwing his ID on the floor. He received one month of C-grade status and 15 days of segregation time.
- *October 19, 2014.* Plaintiff received a second disciplinary ticket for damage or misuse of property, and health, smoking, or safety violations for flooding his cell. He received one

- month of C-grade status, one month of segregation, and a recommendation for a disciplinary transfer.
- *October 24, 2014*. Plaintiff received a disciplinary ticket for sexual misconduct after masturbating towards a female correctional officer. He received one month of C-grade status, a month of segregation, and a recommendation for a disciplinary transfer.
- *October 29, 2014*. Plaintiff received a disciplinary ticket for sexual misconduct after masturbating while staring at a female correctional officer. He received a month of C-grade status, a month of segregation, and a recommendation for a disciplinary transfer.
- *October 31, 2014*. Plaintiff received a disciplinary ticket for damage or misuse of property, possession of contraband, and disobeying a direct order. He received one month of C-grade status, one month of segregation, and a recommendation for a disciplinary transfer.
- *November 2, 2014*. Plaintiff received a disciplinary ticket for disobeying a direct order related to his refusal to cooperate with the change in his crisis watch status. He received another month of C-grade status and 15 days of segregation time.
- *November 9, 2014*. Plaintiff received a disciplinary ticket for impairment of surveillance, and health, smoking, or safety violations. He was sentenced to one month C-grade status, one month of segregation time, and a recommendation for a disciplinary transfer.
- *November 10, 2014*. Plaintiff received a disciplinary ticket for damage or misuse of property and insolence. He received one month of C-grade status and one month of segregation.
- *November 10, 2014*. Plaintiff also received a ticket for unauthorized movement for refusing to move into a double-cell in general population segregation. He given one month C-grade status, one month of segregation, and a recommendation for a disciplinary transfer.
- *November 21, 2014*. Plaintiff received a ticket for unauthorized movement and disobeying a direct order. He received one month of C-grade status, 10-days of segregation time, and a recommendation for a disciplinary transfer.
- *November 21, 2014*. Plaintiff also received a ticket for intimidation or threats, insolence, unauthorized movement, and disobeying a direct order. He was given a 15-day segregation sentence.
- *December 13, 2014*. Plaintiff received a disciplinary ticket for health, smoking, or safety violations. He received one month of C-grade status and 15 days of segregation.
- *December 13, 2014*. Plaintiff received another disciplinary ticket for damage or misuse of property. He received subsequently found guilty and received one month C-grade status and 15 days of segregation.

As set forth in IDOC regulations, an Adjustment Committee hears major tickets issued to inmates. Before the hearing, the inmate is served with the tickets and informed of the charges against him. WSOF ¶ 21. Also before the hearing, a member of Dixon's mental health staff reviews an SMI inmate's ticket and provides a recommendation of the potential consequences of the ticket and an opinion as to whether the inmate's mental illness was a mitigating factor in the behavior that led to the issuance of the ticket. *Id.* ¶ 22. The Adjustment Committee ultimately decides whether to move forward with punishment, if any, for the disciplinary ticket. The Warden, or his designee, has to approve any segregation time or discipline that is given to an inmate. *Id.* ¶ 25.

On December 18, 2014, an SMI Segregation Review Memorandum was issued by Warden Enloe. *Id.* ¶ 62. Inmates with 50 days or more of remaining segregation time have their remaining

sentence reviewed by the SMI Segregation Review Committee. The Committee gets together and reviews the inmate's relevant disciplinary tickets to see if a reduction in segregation time is justified. If the SMI Review Committee recommends a reduction in segregation time, that reduction is sent to the Warden for final approval. *Id.* ¶ 64. In plaintiff's case, the SMI Segregation Review Committee ultimately concluded in December 2014 that plaintiff's segregation time should remain the same. *Id.* ¶ 68.

In the third amended complaint, plaintiff asserts four counts. Counts I and II are § 1983 claims alleging violations of the Eighth and Fourteenth Amendments. Count III is a claim under the Americans with Disabilities Act, and Count IV is a claim under the Rehabilitation Act. In their opening briefs, both sets of defendants offered various reasons why Counts III and IV are not viable. Plaintiff offered no response to any of these arguments. Because he offered no response, summary judgment on these two counts will be granted to defendants and will not be further discussed here. *See Palmer v. Marion Cty.*, 327 F.3d 588, 597-98 (7th Cir. 2003) ("arguments not presented to the district court in response to summary judgement motions are waived").

## ANALYSIS

The parties agree on the legal framework for addressing the two § 1983 Eighth Amendment counts. "By prohibiting cruel and unusual punishment, the Eighth Amendment imposes duties on prison officials to 'provide humane conditions of confinement' and 'ensure that inmates receive adequate food, clothing, shelter, and medical care.'" *Thomas v. Blackard*, 2 F.4th 716, 719 (7th Cir. 2021) (*quoting Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). Officials violate these duties if they exhibit a "deliberate indifference to a substantial risk of serious harm to an inmate." *Id.* Deliberate indifference has two components. First, the harm must be objectively serious. This means not only that the prisoner experienced a serious harm, "but also that there was a substantial risk beforehand that [the] serious harm might actually occur." *Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2005). A finding that the prisoner was exposed to an objectively serious risk of harm cannot be based solely "on what came to pass," but rather the prisoner must show that the likelihood of the harm occurring was sufficiently serious. *Estate of Simpson v. Gorbett*, 863 F.3d 740, 746 (7th Cir. 2017). Second, the defendant prison official "must have actual, and not merely constructive, knowledge of the risk," meaning that he "must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw that inference.'" *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (quoting *Farmer*).

I.    **Wexford Defendants**

Plaintiff has named as defendants four psychologists, employed by Wexford Health Sources, Inc. ("Wexford"), who were each involved in only a limited set of events.[1] The parties organize their arguments around each individual defendant, which is the framework the court will also follow.

A.   **Dr. Jamie Chess—Decision To House Plaintiff In General Population**

---

[1] Dr. Vickroy died in December 2017. Defendant Chantal Irish is the special representative of her estate. [189, ¶ 12.]

4

Plaintiff's only allegation against Dr. Chess is that she should have recommended that plaintiff be housed in a residual treatment unit ("RTU") when he first arrived at Dixon in April 2014. He was instead housed in the general population. Dr. Chess was the Site Mental Health Services Director at the time. Plaintiff alleges that he had a conversation with Dr. Chess shortly after he arrived at Dixon. This was the only time he talked to her. Plaintiff claims that he told Dr. Chess that Dr. Gavali, his treating psychiatrist, had concerns about him being placed in general population. Dr. Chess allegedly responded that there was no room in any RTU at that time.[2] In addition to this conversation, plaintiff relies on one other piece of evidence. He claims that Dr. Gavali told him that Dr. Gavali had spoken directly to Dr. Chess (when plaintiff was not present) and had told Dr. Chess that plaintiff should not be placed in general population. Plaintiff asserts that Dr. Chess should have put him in an RTU where he believes he would have fared better and perhaps avoided some of his later disciplinary problems. This belief is based on plaintiff's prior stays at Dixon, when he was sometimes housed in an RTU and sometimes in general population.

Wexford raises several arguments in response, but the main one is that IDOC already decided, before plaintiff arrived at Dixon, that he would be placed in general population. Therefore, Dr. Chess, a Wexford employee, had no authority to change that initial assignment. Plaintiff has not disputed this specific contention. *See* Pl. Resp. to WSOF ¶ 9 (admitting this fact: "When inmates arrive at the Dixon Correctional Center, their housing classification is already decided"). However, plaintiff appears to be making a slightly different argument, which is that later, after he had been at Dixon for some time, Dr. Chess should have changed that initial assessment.

Did Dr. Chess have any authority to make such a change? The parties debate this question, both relying on Dr. Chess's deposition testimony to support their opposing arguments. Plaintiff relies on statements that Dr. Chess "was part of the decision-making process" about where inmates were housed. Chess Dep. at 20; *see also id.* at 26 ("Yes. I could be part of the decision process [of where an inmate was housed], yes"). Plaintiff believes that this testimony is enough to show that she had some power or ability to affect the housing decision. But as Wexford notes in response, plaintiff overlooks the specific process that was supposed to be followed. Dr. Chess testified that she would only get involved in a housing change request if a specific request was made by a treating psychiatrist or other mental health professional.[3] She further testified that she never received any such request from plaintiff's psychiatrist and that she therefore had no reason to offer her input. In short, she states that she had no authority to *sua sponte* change plaintiff's housing assignment. (This would make some sense because she was not treating plaintiff and would not have any first-hand knowledge of his issues.)

Plaintiff has not disputed Wexford's underlying contention that a request for a housing change must first be initiated by a treating psychiatrist or other mental health professional. Plaintiff argues that Dr. Gavali orally made such a request. This evidence comes not from Dr. Gavali, but from plaintiff. However, as Wexford correctly argues, this evidence is hearsay and cannot be considered now. *See Eaton v. J. H. Findorff & Son, Inc.,* 1 F.4th 508, 513 (7th Cir. 2021)

---

[2] This information comes solely from plaintiff. In her deposition Dr. Chess did not recall the specifics of this conversation, although she believed that she did talk to plaintiff once soon after his arrival. Chess Dep. at 19.

[3] *See* Chess Dep. at 21 (" It depends on the referring clinicians, and it's their determination whether or not that offender needs that higher level of care."); *id.* at 29 ("Well, it would have to be the treating MHP, the treating psychiatrist. *If they were making a recommendation* to [an RTU], I would review that and approve it. It would also have to be reviewed by the transfer coordinator's office in Springfield and approved.") (emphasis added).

("Inadmissible hearsay evidence may not be considered on summary judgment."). Aside from this hearsay statement, plaintiff has no other evidence to support his claim despite having had ample time in discovery to develop it. As a result, the undisputed facts show that Dr. Chess never received a recommendation for a housing change. She therefore cannot be faulted for not acting on it. *See Arnett v. Webster*, 658 F.3d 742, 757 (7th Cir. 2011) (defendant must have had some personal involvement to be found liable under § 1983).

### B. Dr. Patricia Vickroy—Opinions Given to the Adjustment Committee

Plaintiff has sued Dr. Vickroy for her role in providing several opinions to the Adjustment Committee. As noted above, when the Adjustment Committee reviews major disciplinary tickets issued to SMI inmates, a member of Dixon's mental health staff provides an opinion as to whether the inmate's mental illness was a mitigating factor in the behavior leading to the disciplinary ticket. Dr. Vickroy gave four "mitigating factor" opinions—one on October 21st, October 30th, November 3rd, and November 24th. In her October 21st opinion, Dr. Vickroy addressed two disciplinary tickets given on October 19th, the day plaintiff attempted suicide. For these tickets, Dr. Vickroy concluded that plaintiff's mental illnesses may have contributed to the offenses and that segregation would be inappropriate unless plaintiff were double-celled rather than single-celled. As for the remaining three opinions, in each instance, Dr. Vickroy concluded that plaintiff's mental illnesses were not a mitigating factor and that he should receive segregation time "as appropriate" for the offenses.

Plaintiff alleges that, in rendering these four opinions, Dr. Vickroy never "took her job seriously" and failed to "serv[e] as the gatekeeper to segregation time." [265 at pp. 9, 10.] Plaintiff believes that if Dr. Vickroy had not made what he claims was a superficial review, he would not have ended up with "over 6 months cumulative segregation time." *Id.* at p. 9. Plaintiff's argument rests on a two-step syllogism. He first asserts that he had "prodigious" mental illnesses. Then, he asserts that it "defies credibility to believe" that Dr. Vickroy could have found that plaintiff's mental illnesses contributed to his behavior only one out of four times. *Id.* at p. 10.

Wexford responds that there is no evidence suggesting that Dr. Vickroy was not acting in good faith in rendering her professional opinions. As such, her clinical professional judgments are entitled to deference. *See Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008) ("A medical professional acting in his professional capacity may be held to have displayed deliberate indifference only if 'the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment.'") (*quoting Collignon v. Milwaukee Cty.*, 163 F.3d 982, 988 (7th Cir.1998)). This court agrees.

Plaintiff offers two main arguments in response. The first argument is a procedural one. He asserts that Dr. Vickroy should have met with him before rendering her opinions or, alternatively, should have attended the disciplinary hearings. But plaintiff has not pointed to any authority suggesting any such requirements existed. Plaintiff also has not explained why it would have been improper for Dr. Vickroy to have rendered her opinions by relying on plaintiff's records, which included in-person assessments made by other mental health professionals working at Dixon. Plaintiff's second argument attacks the substance of the decision. He picks out several statements

from the same treatment records Dr. Vickroy reviewed and argues that those statements support his belief that his psychiatric illnesses were a mitigating factor. For example, he relies on an October 22nd note stating that plaintiff had stopped taking his medications and was suffering from a "substance-induced mood disorder" and a November 18, 2014 note stating that plaintiff was "still hearing voices" and that it was "very difficult to medicate him." PSAF ¶ 23. Plaintiff believes that these observations raise doubts about the correctness of Dr. Vickroy's opinions. But the mere existence of these types of statements is not sufficient, standing alone, to show that Dr. Vickroy's opinions substantially departed from professional standards. *See Sain*, 512 F.3d at 895. No evidence has been offered to suggest that Dr. Vickroy was unaware of these statements and did not factor them into her analysis. Medical professionals sometimes have to reconcile competing pieces of information that do not all cleanly point to a simple unified conclusion, and two professionals both acting in good faith can reach contrary conclusions based on the same record. Here, plaintiff is relying only on the layperson review of these treatment notes made by his counsel, and he has not offered any other medical testimony suggesting that Dr. Vickroy's conclusions were outside professional norms. *See, e.g., Barrows v. Goldman*, --- Fed. Appx. ---, 2021 WL 4065538, *3 (7th Cir. Sept. 7, 2021) (affirming summary judgment: "the record contains no medical evidence contradicting" the doctor's opinion and no evidence suggesting that the opinion "was motivated by other factors—such as cost or retaliation—that had nothing to do with medical judgment"). So too here. Plaintiff has not suggested that Dr. Vickroy was motivated by any improper factor and was not trying to render her honest professional judgment.[4]

### C. Dr. Lisa Schoenberger—the November 2nd Incident

Plaintiff is suing Dr. Schoenberger based on her actions on November 2, 2014. On that day, she visited plaintiff who was then on suicide watch, being seen at 30-minute intervals. In her deposition, Dr. Schoenberger gave the following account of what happened. When she talked to plaintiff, he was agitated and did not cooperate in answering her questions. She was concerned that he may have removed some screws from his cell and might swallow them. She was also concerned about his history of prior suicide attempts. When she told him that he could not go into the dayroom, he began yelling and kicking the door of his cell aggressively and said that he was going to resort to "extreme violence." When asked to explain the latter statement, he stated: "I'm not going to tell you. You're going to have to fucking find out." WSOF ¶ 42. Based on these facts, Dr. Schoenberger concluded that plaintiff's suicide watch intervals should be reduced from 30 minutes to 10 minutes and that his access to his personal property should be limited. When plaintiff refused to cooperate, the tactical team was called to intervene. *Id.* ¶ 45.

Plaintiff has not disputed most of the allegations set forth in the previous paragraph. He objects to the characterization that he was "aggressively" kicking the door. [266 at p. 17.] He argues that the concern over the screws was unfounded because he had removed them on October 31st and had already given them to officers by November 2nd. PSAF ¶ 30. He states that he did not "directly express" any intent to harm himself. [265 at p. 11.] He also claims that he was "feeling mentally stable" and was "complying with his medications." PSAF, ¶ 28. He states that he asked

---

[4] Wexford raises other arguments here. One is that a finding of wrongdoing against Dr. Vickroy would run afoul of the *Heck* doctrine because plaintiff would effectively be challenging the correctness of the underlying disciplinary decisions. Plaintiff never responded to this argument. Given the court's finding above, the court concludes that it need not address this and other additional arguments.

Dr. Schoenberger to remove him from suicide watch because he "had not been permitted to bathe or brush his teeth since October 19th." *Id.* ¶¶ 25, 28. Dr. Schoenberger allegedly told him that the suicide watch restrictions were "the consequence for his suicide attempt." *Id.* ¶ 28. Based on these facts, plaintiff believes that Dr. Schoenberger did not have a valid basis for reducing his suicide watch interval and limiting him access to his personal property.

The court concludes that plaintiff has not shown that Dr. Schoenberger was acting in bad faith or that her professional judgments were outside of professional norms. Accepting plaintiff's version of events, he was still indisputably agitated, uncooperative, and making threatening statements. He had attempted suicide just a few weeks earlier. Plaintiff's self-assessment that he felt "mentally stable" that day does not necessarily mean that he was correct in that assessment. He was suffering from multiple psychiatric illnesses that could affected his ability to accurately perceive his own condition. Defendants have generally complained in this lawsuit that plaintiff makes inconsistent allegations from one moment to the next. This criticism is relevant here. In this instance, plaintiff is arguing officials were too strict in monitoring him for the risk of suicide on November 2nd, but he elsewhere alleges that, on October 19th, that they were too lax. As the Seventh Circuit has noted, assessments of suicide risk are very difficult in part because "[m]ental health is notoriously difficult to assess and treat" *Quinn v. Wexford Health Sources, Inc.*, 8 F.4th 557, 569 (7th Cir. 2021). And healthcare professionals are sometimes sued for doing just what plaintiff was advocating being done here—*i.e.* being more lenient in imposing suicide watch restrictions. *See, e.g, Barrows*, 2021 WL 4065538 at *2 (inmate sued healthcare professionals for "keeping him on 15-minute supervision" instead of "order[ing] a higher level of monitoring or plac[ing] him in restraints"). In sum, even viewing the evidence in plaintiff's favor, no reasonable jury could find that Dr. Schoenberger was deliberately indifferent. Plaintiff has not offered evidence that another medical professional would have reached different decisions. *See Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (that "*some* medical professionals would have chosen a different course of treatment is insufficient" to show indifference) (emphasis in original).

As for plaintiff's allegation that the tactical team used too much force, plaintiff has not shown why Dr. Schoenberger should be held responsible for their actions. It is undisputed that Dixon regulations required that the tactical team be called after plaintiff resisted the changes in his suicide watch. Other than his vague allegation that Dr. Schoenberger was "in the vicinity" at the time of the extraction, plaintiff has not offered any evidence that she directed the team's actions once they arrived or had authority to control how the operation was performed. *See* WSOF ¶ 45.

### D. Dr. Sheila Stone—Opinions Given to the Segregation Committee

Plaintiff's allegations against Dr. Stone relate solely to one instance where she provided a "mitigating factor" opinion to the SMI Segregation Review Committee. The court concludes that no reasonable jury could conclude that Dr. Stone acted with deliberate indifference.

To recap the relevant facts, Dr. Stone participated in the SMI Segregation Review for plaintiff in December 2014. She did not usually work on this committee, but did so only in this one instance. On December 18th, Dr. Stone assessed cumulative segregation time plaintiff had received for earlier disciplinary tickets. She recommended that the segregation time remain the same. WSOF ¶ 68.

8

Plaintiff raises the same two basic arguments he used to attack Dr. Vickroy's "mitigating factor" opinions. First, he complains that Dr. Stone did not interview him or speak directly to his treating psychiatrist. Although these points are true, it is also undisputed that Dr. Stone reviewed all the available records relevant to this issue. *See* PSAF ¶ 34 (admitting that Dr. Stone reviewed plaintiff's "medical records, mental health treatment plan, and other mental health documents"). These materials included assessments by multiple other mental health counselors and social workers, among other things. *See* Stone Dep. at pp. 56-60. Plaintiff apparently believes that it would be reckless for someone in Dr. Stone's position to render a judgment based on just the "paper file," but plaintiff has not cited to any authority to support this proposition. Second, plaintiff tries to second guess Dr. Stone's professional judgment by cherrypicking certain statements from the treatment records that he believes cut against her conclusions. This is the same argument made against Dr. Vickroy's opinions and fails for the same reasons—namely, no evidence suggests that Dr. Stone did not consider this contrary evidence and there is no contrary medical opinion. In short, "without more, a mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources, Inc.,* 839 F.3d 685, 662 (7th Cir. 2016).

## II. IDOC Defendants

The four IDOC defendants are acting Warden Donald Enloe, Superintendent Carl Eubanks, Major Joanna Kemmeren, and Correctional Officer Raphael Chavez. Plaintiff's allegations against them relate to many of the same incidents discussed above. These allegations are vague and often not clearly tied to any particular defendant. Rather than organizing the discussion around each individual defendant as was done in Section I, the court follow the approach taken by the IDOC defendants and discuss the three main subject areas.

### A. Housing Complaints

Plaintiff makes several housing-related allegations against the IDOC defendants. These include his initial placement in general population (already discussed); his placement in a cell for one week in September 2014 with several inmates, one of whom was suicidal, thus allegedly increasing his suicide risk; and his placement in October 2014 into a cell with three inmates who were *not* having psychiatric problems, but who were allegedly prone to violence. Plaintiff alleges that these stays caused him anxiety and may have contributed to his October 19th suicide attempt.

Plaintiff has failed to provide sufficient evidence that these four defendants were involved in these decisions, much less acted with deliberate indifference. Plaintiff only alleges in general terms that Warden Enloe had responsibility for coordinating different levels of housing, but he has not shown that Enloe was aware of any of these particular housing arrangements or knew that they would cause plaintiff undue distress. As for the September stay with the inmate who attempted suicide, plaintiff did not attempt suicide during or shortly after this period or otherwise engage in self-harm during this period. As for the October stay with the three other inmates, he has likewise not specified what harm this caused him. The suggestion that these two stays were the cause of his later suicide is speculative and not grounded in any medical opinion. In any event, no evidence suggests that any of these particular defendants knew about this alleged risk.

One final point on housing. Plaintiff has also complained that he was put back into segregation sometime after his suicide attempt, and he further complains that no one followed Dr. Vickroy's recommendation that he be double-celled to mitigate suicide risks. It is not clear why this recommendation was not carried out, but plaintiff has not tied this apparent oversight to any of the four IDOC defendants. The record is undisputed that Warden Enloe approved the request that plaintiff be double-celled.

### B. Discipline and Segregation

Plaintiff alleges that he received too many disciplinary tickets and too much cumulative segregation time. His central claim is that nobody ever adequately considered the role his mental illnesses played in causing his behavior. He argues that the four IDOC defendants, in their various roles in the adjudicative process, should have overruled the findings made by the Wexford psychologists who concluded that, for most offenses, plaintiff's mental illnesses were not a mitigating factor in the behavior at issue.[5] In making these arguments, plaintiff does not delve into the specific incidents or hearings, nor dispute that he engaged in the alleged behavior, nor does he focus with any particularity on the actions of the specific defendants. His argument is instead anchored around the general proposition that he was being punished rather than treated for his mental illnesses.

After reviewing the briefs and exhibits, the court concludes that plaintiff has failed to bring forth sufficient evidence to allow a jury to find that the IDOC defendants acted with deliberate indifference. Most significantly, none of the IDOC defendants rejected the opinions from the Wexford psychologists—specifically the "mitigating factor" opinions. Because the IDOC defendants were not mental health professionals, they should be entitled to rely on these opinions as to the specific issue of whether plaintiff's mental illnesses played a role in the particular offenses. *See Arnett*, 658 F.3d at 757. In addition, plaintiff's disciplinary tickets were considered in a regular and multi-level review process with multiple individuals assessing his case. He was given progressive discipline over a year and a half period. Other than his assertions addressed above, he has not argued that the process was applied in some arbitrary or irregular way. Third, and more generally, he has not offered any evidence to suggest that these four defendants were acting with a culpable state of mind. *See, e.g., Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015). At its core, plaintiff's case ultimately rests on his 10,000-foot-level assertion that it simply defies credibility to believe that anyone could have found that he deserved the amount of segregation time he got. But without providing some concrete evidence as to why the psychologists were grossly wrong, this court does not believe that this type of broad-based inference is enough to create a jury issue. If it were, then it would essentially allow for the slippery-slope conclusion that every single action plaintiff took—and even every future action he will take—was fatally and completely determined by his mental illnesses.[6]

---

[5] As for each defendant's role, plaintiff alleges that Enloe approved every adjustment committee recommendation and "rubber stamped" the SMI Committee's segregation recommendation; Eubanks served on the SMI Committee; and Kemmeren and Chavez were, at different times, the chairperson of the Adjustment Committee.

[6] As for plaintiff's brief assertion that his offenses were "vaguely defined" (3AC, ¶ 33), this argument is undeveloped. As discussed above, he does not discuss the specific charges. Further, as IDOC notes, all of plaintiff's disciplinary tickets set forth specific offense codes, and plaintiff was also given an orientation manual with these same codes.

### C. Suicide Issues

Plaintiff raises several arguments about his October 19th suicide attempt. First, he alleges that his "suicide attempt should have been predicted" at some indeterminate time in advance. [280 at p.6.] Second, he alleges that he was given insufficient monitoring in the several-hour period before the attempt. His free-floating claim that someone should have "predicted" that he would attempt suicide is speculative. *See, e.g, Quinn*, 8 F.4th at 569. But even accepting plaintiff's contention that someone should have known about the specific attempt (and this contention is itself speculative), plaintiff has not shown that these four defendants had any such knowledge. As for the alleged failure to monitor him in the several-hour period before he attempted suicide, he again has not shown that these four defendants participated in, or had knowledge of, these events. Moreover, as the IDOC defendants point out, plaintiff was not on suicide watch on the 19th, and he did not alert anyone to his intent to harm himself.

Plaintiff also tries to blame the IDOC defendants for the November 2nd change in plaintiff's suicide watch and for the tactical team extraction that same day. Here again, no evidence suggests these four defendants played any role. The only allegation tangentially connecting them is the assertion that defendant Enloe had some authority regarding the calling of the tactical team. This issue is unclear in the record, but assuming he had some authority, this would not make him liable because, as set forth above, Dixon regulations dictated that the tactical team must be called in this situation. To the extent that the tactical team could be found to have been too aggressive in carrying out the extraction, Enloe could not be held responsible since plaintiff has not argued that he was in control of the team's moment-by-moment decisions.[7]

The court acknowledges that defendants offered additional arguments for summary judgment, including their assertion that certain claims are barred under *Heck* and that the doctrine of qualified immunity adds an extra level of deference. The court need not address these arguments because the reasons set forth above are sufficient to grant summary judgment to the defendants on all counts. Finally, the court thanks appointed counsel for representing plaintiff in this case.

### ORDER

Defendants' motions for summary judgment [256, 272] are granted, and judgment is granted in their favor on all counts. This case is closed.

Date: 9/21/2021  ENTER:

_Philip G. Reinhard_
_____
United States District Court Judge
Electronic Notices. (LC)

---

[7] IDOC submitted a video of the extraction, but the court was unable to access the video because it was not submitted in the format required by the court. The court then requested that the IDOC defendants re-submit the video in the manner prescribed the rules set forth on the court's website [288]. To date, the IDOC defendants have not re-submitted the video. However, the court concludes that it need not wait for the video because neither side based any material argument on it and because the court's ruling does not turn on the specific way the raid was executed.